[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This custodial dispute, arising within a dissolution action, CT Page 3713 involves a plaintiff wife, aged 29 this month, and a defendant husband, aged 31, who married in New London, Connecticut, on April 9, 1988, four years ago. It was the second marriage for each. The spouses' births, their wedding and their divorce all took place during the month of April.
There was one minor child of their marriage:
Danielle Joseph, born September 21, 1989.
They have both resided continuously in this state for the past twelve months. Neither is the recipient of public assistance from the State of Connecticut or any governmental subdivision. Each testifies that their marriage has broken down irretrievably.
The trial itself did not begin as scheduled. The parties, mother, father and child, all advised the court that they had agreed upon both joint legal custody and joint physical custody. Only the details of the joint custodianships remained to be addressed, they said. They sought, and were granted, an opportunity to settle those details.
They were not successful.
As the trial was about to begin, the court voiced its concern, warning the parties that the trial process would likely undermine those agreements they had reached, exacerbate their differences and expand their disputes.
During three days of trial, those concerns were realized. The parties now dispute joint custody, have different access preferences and are requesting different financial orders.
As this hearing has dramatically demonstrated, trials, particularly in family court, incite and embitter. Direct and cross examinations become breeding grounds for anecdotes that soon develop into painful family folklore. Third party witnesses, subpoenaed against their will, are often reduced to tears and robbed of their dignity. Children are stripped of their privacy, become objects of relevant gossip, and often become metaphors for control. Grandparents are terrified and their role is often either trivialized or magnified. Trial generated antagonisms CT Page 3714 often cause judgments to become launching pads for the next hearing. Courts become enmeshed with requests for retrials, motions to modify and appeals. Once begun, the discordant dance is difficult to stop.
Mutually negotiated settlements, modestly satisfying though they may be, are most often far superior to courtroom victories.
The court watched as this family, once just a few scant details from full resolution of their dispute, became acerbic, contentious and rigid. Their opportunity for dignity was replaced with a lust for conquest.
FINDINGS RE: CUSTODY
There were six witnesses during the three day trial.
Sheryl Howitt, the child's sitter, shed more tears than light. She was loyal to the family and eager to do no harm. The discomfort she experienced was far out of proportion to her very limited relevance.
Josephine Joseph, mother of the defendant, suffered convenient memory lapses during cross examination, after enjoying a clear memory during direct examination. She was eager to do everything within her power to assist her son in his custodial and financial quest. She was not a credible witness.
Susan E. Peterman, Ph.D., court appointed psychologist, evaluated the Joseph family. Dr. Peterman earned her Ph.D. at the University of Virginia in 1989, was an intern at the Institute of Living in Hartford 1988-1989 and a staff psychologist at the Institute 1989-1991. She joined Bank and Hiebel Family and Child Associates in 1991. She advised that this was her first custody evaluation.
Dr. Peterman recommended joint legal and physical custody, with Danielle spending one half of her time with each parent. She suggested Monday, Wednesday and Friday and alternate weekends with her father and alternating time with her mother, producing a mathematically precise division of twenty-four hour days and forty-eight hour weekends.
When questioned by the court, Dr. Peterman reported she had tested each of the parents but had not tested the child. Her clinical observations led her to conclude that the child, who was two years old at the time of the evaluation, "had adjusted quite well" to the alternating schedule then in effect.
The court finds the potential impact of daily changes of CT Page 3715 morning and evening routines upon the child is too problematic to be dismissed with the simple observations that the child "does not [seem]* to exhibit any difficulties" or that "Danielle [seems]* to have adjusted quite well to . . . the current visitation schedule". Testing of the child should have been undertaken.
A daily change of a child's dinner and bedtime routines and a daily change of a child's breakfast and morning routines, is at the farthest extreme of possible access formulae. Daily change is a formula capable of generating substantial stress for a young child. Combined with a mathematically precise division of the child's time, the court sees Dr. Peterman's recommendation as parent centered rather than child centered. It is calculated to avoid parental piques rather than to promote the best interests of this child who is now two and a half years old. It appears to stem from the belief that splitting the prize down the middle is the fairest means to resolve an impasse, a resolution unacceptable to both King Solomon and this court.
The thought that a child of thirty months should be retained on a daily alternating schedule because it has already been imposed upon her, and she [seems]* to show no damage, appears analogous to the recently popular theory that children require little anesthesia during surgery because they [seem]* to show no pain.
Maret DiGangi, the Family Relations Counselor, similarly recommends that the alternating schedule of the current joint custodyship be maintained, with Danielle alternating daily between the parents. Counselor DiGangi makes note of Dr. Peterman's evaluation in reaching her own similar conclusions.
The court does not find the recommendations of Dr. Peterman or Counselor DiGangi to be appropriate to this fact situation.
Having said that, the court wishes to note that Dr. Peterman presented with sincerity and without defensiveness. She is clearly a concerned professional and this court looks forward to dealing with her in the future. Counselor DiGangi, similarly, has the respect of this court.
Both James Joseph and Lynette Joseph testified at some length. The court had ample opportunities to evaluate each of them, finding Lynette to be the more credible.
James was evasive and vague during much of his testimony. He evaded cross examination with an intense passivity that was almost pugnacious. He was particularly evasive when examined about his finances. When not being passive, he was quite firm. CT Page 3716 Nothing seemed spontaneous. He had a hovering presence. He was not intimidating as much as he was unsettling.
He represents a formidable presence, particularly when compared with the plaintiff, Lynette Joseph. She testified in a temperate manner, soft of speech, spontaneous and without a pattern of aggression. When offered opportunities to make partisan points, she demurred, unlike her husband. She impresses as one who has been socialized to defer, to avoid confrontation, particularly in her dealings with men.
Lynette Joseph gave birth to two children out of her relationship with Scott Donovan. She recently terminated her relationship with him when he showed he was unable to do without alcohol. Mr. Donovan is now in jail. She raises the two Donovan children herself, without assistance from their father, and agrees it is appropriate to limit his access to Danielle. James Joseph stresses the Donovan connection as a basis for denying Lynette Joseph primary care of Danielle. Within the context of this case, this court does not agree.
Sydney Rose Donovan, born to Lynette Joseph on October 12, 1991, during the parties' separation, is not the child of the defendant, James Joseph. Paternity has been acknowledged by Scott Donovan via a sworn affidavit dated March 20, 1992.
James Joseph's courtroom demeanor, and his history during this dispute, suggests he is the more rigid, the less yielding, the less sensitive, the more aggressive and the less likely to be willing to adjust in order to balance the other parent's needs or preferences. Throughout the trial he remained five weeks in arrears for child support, while current in his rent payments to his mother, an unusual posture for someone pleading concern for his daughter. He had not completed Danielle's bedroom, promised for many months. He had cut Danielle's hair short against her mother's wishes. At one point, he changed Danielle's clothes when she arrived at his house, not wanting her to wear the clothes her mother chose for her. He has followed his wife when she was with Danielle, and when challenged he refused to stop, creating a two day trial to avoid a restraining order.
The tone of the trial itself highlights the need for one central parental authority, for one primary attachment, in order to provide for the child caught in this whirlpool of parental competition. If we add to the tone of the trial, the parents' inability to resolve minor access details after agreeing to the principle of equal access, the ambivalence of dealing with this custodial dispute via mathematical equality becomes more unsettling. The courtroom confrontation established that neither CT Page 3717 parent sees the other as their equal.
The court wishes to express its appreciation for the efforts of counsel for the minor child, Ramona DeSalvo Dittman, whose custodial recommendations and supporting reasoning were both helpful and reassuring. Attorney Dittman was an active, independant and welcome participant in the court's search for the best interests of young Danielle.
FINDINGS RE: FINANCES
Defendant father's current employment pattern has been calculated to enhance his custodial quest and minimize his support obligations. As the result of living with his very supportive mother, James Joseph has little need for much beyond minimal income. His current employment reflects that. His current employment is artificial and adversarial. His current income is artificially low.
Defendant husband's current sworn financial affidavit does not accurately reflect his annual earnings, but rather reflects an historically slow portion of his business year. Under cross examination he admitted: "This quarter (January, February and March 1992, used in defendant's sworn financial affidavit) has been extremely slow." and "I anticipate earning much more this summer."
Further, defendant husband followed a pattern calculated to obscure his finances by denying plaintiff mother adequate and accurate financial information during the pre-trial discovery process. It was not until the final moments of trial that James Joseph produced the financial information, which he testified he had unearthed "this weekend".
From the evidence and testimony available to it, the court finds James Joseph to have an earning capacity of $350 net income per week. Lynette Joseph's net income is $346 when the $286.97 shown on her sworn financial affidavit is combined with her $19.40 weekly RISP retirement contribution and the $40 she earns each week cleaning Yankee Remodelers.
The court finds the Child Support Guidelines to be equitable and appropriate in determining support obligation in this case and will apply the guidelines.
Plaintiff mother has a 401K plan valued at $7867, a marital asset. She has a life insurance policy with a $1169 cash value, one half of which, $585, is a marital asset. She also has a 1987 Nissan Maxima with an equity of $1160. The three assets total $9612. CT Page 3718
If UNC does not fire Lynette Joseph before January 1, 1993, and if she does not leave for other employment before January 1, 1993, Lynette Joseph will become entitled to a bonus and severance pay on January 1, 1993, when her employer, UNC Naval Products, will terminate. In view of corporate behavior towards employees during this recession, and the payments being dependent upon plaintiff mother's post dissolution behavior as an employee, the court does not consider the possible future UNC payments to be a current marital asset in this fact situation.
Defendant father testified to purchasing $15,291 of audio equipment for his business with marital funds and testified to cashing in: $13,400 of marital annuities, $7000 as the marital share of two Solomon pension plans and $10,000 as the marital share of his IRA, for a total of $45,691. In addition, there is evidence he retains a 1980 Chevrolet van valued at $2000, an L M Hospital Credit Union IRA valued at $2180 and that he cashed in $9992 in retirement assets and $14,897 after penalties from his annuities. The court was not advised the marital share of the latter assets of this four year marriage. Defendant's vagueness could have handicapped the court if plaintiff had asked for an award in excess of her $15,000 request.
If plaintiff's $9612 of marital assets are deducted from defendant's $45,691, the difference is $36,079. The amount necessary to balance the marital assets equally then becomes $18,040.
Plaintiff, during final argument, asked for $15,000 as lump sum alimony in lieu of alimony, attorney's fees and plaintiff wife's share of the marital assets taken by husband. The sum requested makes the lack of precise accounting of all the assets retained by defendant understandable.
In its calculation of this issue, the court recognizes that some of the audio equipment retained by defendant was purchased through charge cards for which he has assumed responsibility.
One of the tragedies of a custodial dispute is dramatically revealed by a review of the financial orders that necessarily follow in the wake of the trial. The parties hire their own attorneys, hire a counsel to represent their minor child, hire a psychologist, and often use marital assets during the dispute to pay their bills. Accountability is postponed until the final hearing when responsibility must be faced. Bills must be paid for services rendered and assets usurped. All this in addition to the child's financial support and medical protection during CT Page 3719 her minority.
Invested otherwise, the attorney's fees and psychologist's fees may well have been enough to pay for Danielle's college education.
The court hopes the parties are wise enough, and strong enough, to avoid future asset drains by mediating their future differences through the Family Relations Division of the Superior Court.
ORDERS:
Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, a finding shall enter that the marriage has broken down irretrievable, a dissolution shall enter and the following orders shall apply:
1. CUSTODY
a. The parties shall share joint legal custody of the minor child, Danielle.
b. Plaintiff mother shall have primary physical custody of Danielle and shall have primary day-to-day responsibility and authority for her care.
c. The parties shall consult on major decisions involving Danielle's health and education.
d. If the parties are unable to reach an agreement, plaintiff mother's decision shall be final.
2. ACCESS
a. Defendant father shall have reasonable rights of access to Danielle, which shall include the following:
 i. Mondays through Fridays during the day, approximately 8 am to 5 pm, enabling father to provide care for the child during her daytime hours,
ii. Thursdays overnight
 iii. Two non-consecutive weeks during the summer months, scheduled after consultation with the primary physical custodian. CT Page 3720
b. Plaintiff mother shall have access:
i. Mondays through Wednesdays, evenings and overnights,
ii. Fridays at about 5 pm through to Monday mornings
iii. Two non-consecutive weeks during the summer months.
3. HOLIDAYS
a. Parents shall alternate Easter Sunday, Thanksgiving, Christmas Eve and Christmas Day. Mother will establish the alternating schedule.
b. Mother shall have Mother's Day. Father shall have Father's Day.
4. INFORMATION
a. The court notes the provisions of Section 46b-56 (e) of the Connecticut General Statutes:
 "A parent not granted custody of a minor child shall not be denied the right of access to the academic, medical, hospital or other health records of such minor child unless otherwise ordered by the court for good cause show."
b. This court enters no orders contrary to this right of access and, further, directs plaintiff mother to comply with the letter and with the spirit of this right.
c. Mother shall notify all academic and health providers of father's name and address and of his rights to those records.
5. CHILD SUPPORT
a. In accordance with the Child Support Guidelines, defendant father shall pay plaintiff mother child support of $91 a week.
b. For the tax year 1991 and each year thereafter, defendant shall provide plaintiff with a copy of his federal and state income tax return, both personal and corporate, if any there be, to enable plaintiff to be aware of her child support entitlements.
6. DANIELLE AS DEPENDANT
a. Defendant father shall be entitled to claim Danielle as a dependant for income tax purposes, provided he is fully CT Page 3721 current with all payments, disclosures and responsibilities called for by these orders as they may be amended from time to time.
b. Currently, see paragraphs 5, 7, 8, 9, 12, 13 and 14 of these orders, among others.
c. Plaintiff mother shall execute all the necessary documents furnished to her by defendant father to enable him to exercise that entitlement.
7. SCOTT DONOVAN
a. Defendant mother shall not allow Scott Donovan to live or have overnight visits in her home.
b. Mother shall only allow Scott Donovan access to Danielle if it is incident to his visits to his own children and if all of his time with Danielle is supervised by a responsible adult.
c. The limited access to Danielle set forth above is allowed only if Scott Donovan is alcohol free and drug free and is receiving on-going professional therapy.
8. MODIFICATION
a. When Danielle is admitted to full time school, or whenever either parent seeks modification of the custodial or access orders set forth in this memorandum of decision, the parties shall jointly:
 i. bring Danielle to the Yale Child Study Center for a full evaluation, specifically including age appropriate testing, and
 ii. evaluation in hand, meet with a Family Relations mediator prior to bringing any motions to modify access.
b. The parent initiating the modification attempt shall be responsible for the cost of the Yale Child Study Center evaluation. However, if the modification attempt is contemporaneous with Danielle beginning full time public school, the parties will share the cost of that evaluation equally.
9. MEDICAL INSURANCE
a. That parent who has medical insurance available for the minor child at the lowest cost, considering the relative benefits of the plan, shall maintain such plan for the minor child. CT Page 3722
b. The parents shall each promptly pay their one-half share the cost of said insurance.
c. In addition, the parties shall promptly pay their one-half share of all unreimbursed medical, optical, prescription, orthodonture, mental health care and all other costs incurred for Danielle's physical or mental health.
d. The provisions of Section 46b-84(c) of the Connecticut General Statutes shall apply.
10. LUMP SUM ALIMONY
a. Lump sum alimony of $12,000 shall be paid by defendant to plaintiff as follows:
 Beginning March 1, 1993, the monthly sum of $287.36, and a similar sum on the first day of each month thereafter, for a total of 48 consecutive monthly payments.
b. The lump sum payments represents $12,000 amortized over a four year period at 7% interest per annum.
c. Should defendant so choose, he is empowered to pay the full balance due at any time, together with interest due to the date of payment, thus avoiding future interest payments.
11. PERIODIC ALIMONY
Neither party shall pay periodic alimony to the other
12. ATTORNEY'S FEES
Each party shall pay their own attorney's fees.
13. PERSONAL PROPERTY
a. Each party shall keep any and all items of personal property currently in their possession.
b. Each party shall retain whatever motor vehicles they now have and each shall execute whatever documents are necessary to convey title thereto.
14. COUNSEL FOR THE MINOR CHILD
a. Counsel for the minor child, Ramona DeSalvo Dittman, is awarded $3500 for her services. CT Page 3723
b. Each party is directed to pay said counsel a total of $1750 at the rate of $175 a month beginning May 1, 1992, and the first day of each month thereafter until paid in full.
15. DEBTS
Each party shall be responsible for the debts listed on their own sworn financial affidavit and shall hold the other harmless therefrom.
16. APPEAL
The foregoing orders with respect to custody and visitation and child support shall stand and operate as interim orders of the court during the pendency of any appeal.
JOSEPH L. STEINBERG, JUDGE